**STARRETT CORPORATION et al. v. FIFTH AVE. & TWENTY–NINTH ST. CORPORATION et al.**

District Court, S. D. New York.

Feb. 9, 1932.

Supplemental Opinion March 28, 1932.

White & Case, of New York City (Lowell Wadmond, of New York City, of counsel), for plaintiffs.

Baker & Obermeier, of New York City (David V. Cahill, Nathan Probst, Jr., and Alvin S. Rosenson, all of New York City, of counsel), for defendants.

CAFFEY, District Judge.

This case has proved to be quite interesting. The bill was filed quickly; the answer was filed quickly; very soon after, the trial was brought on. It has been very fully and adequately and fairly presented by counsel on both sides.

There are a good many things in the bill and in the proof, as frequently happens in litigation, which have become immaterial. As I have indicated to you, there are some questions presented which are difficult. I tell you quite frankly that I have entertained considerable doubt about them. I am not sure now whether I am correct in my views

about all of them. I can only give you my best judgment on them.

There are two plaintiffs. As has been recognized by counsel in their briefs and in their oral arguments, in most respects the issues as to the two plaintiffs are separate. We can the more clearly understand the issues, and I think the better arrive at a result, if the matters be considered as if there were two separate suits; one by a stockholder, and the other by a second mortgagee.

Upon certain phases of the facts there have been direct conflicts in the testimony. I doubt, however, whether it is essential, in order to dispose of the case, to pass on any substantial portion of the disputes in the proof. In this case, as so frequently happens and as I have previously indicated, in the final solution we get down to a few main features on the basis of which the equities as between the parties are to be decided.

Certainly it is better, and indeed I believe it is necessary, before proceeding to the consideration of details, to have in mind the background. About it there is no controversy. It is in the light of this background that the relative rights of the parties are to be determined.

There is no substantial difference in the figures to which I shall refer as they stood on the day of the stockholders' meeting, December 23, 1931, and on the day of the execution of the contract of sale, January 20, 1932. I shall, therefore, use figures indiscriminately as if they were the same on both days, because the variations are immaterial. So also I shall use only round figures.

The debts of the corporation were, on the first mortgage, $3,055,000; on the second mortgage, $350,000; and on what has been referred to during the trial as the stockholders' notes, $163,000. The first mortgage matures in 1948, some years hence. The bonds are now selling apparently around 28 to 30, or thereabouts. The second mortgage matures in 1933. I refer to the $163,000 of note indebtedness as that due stockholders. The proof is that $133,000 of it is directly held by stockholders—I think it checks dollar for dollar as to the $133,000. The balance of $30,000 was owing to Thoens & Flaunlacher, Inc., but as of the period with which we are concerned, Mr. Thoens individually, who is a large stockholder of the defendant corporation, owned all the stock in Thoens & Flaunlacher, Inc. From the standpoint of the equities, therefore, the $30,000 may just as well be included as if directly owed to a stockholder. I shall accordingly refer to the entire $163,000 as the stockholders' notes.

The assets consisted of the defendant's building at 261 Fifth avenue, at the corner of Fifth avenue and Twenty-Ninth street. In addition, as of the time with which we are concerned, there was cash on hand of approximately $25,000. The carrying charges, including the service on the loans on the building, aggregated $464,000. Excluding income from the Hibernia lease and excluding the vacant space in the building from consideration, the income was $400,000. This would leave the difference, or $64,000, to be found elsewhere.

The Hibernia lease is to run until 1950. The range of rent under it is from $59,000 a year, to which it has already risen, to $69,000 a year eventually, making an average annual rent of $65,000, roughly. It is immaterial what the precise amount is. The consequence is that the $400,000 income I have referred to from rentals, if supplemented by the Hibernia lease, would just about carry the property.

In the building there are approximately 100,000 square feet of space not rented—vacant. It may be wise not to rent it at the procurable rate; but it is rentable, according to the proof, at from one hundred to one hundred and twenty-five thousand dollars. In other words, by renting the vacant space the defendant corporation could increase its annual income by from $100,000 to $125,000.

It is manifest, and indeed it is the contention of both sides, that the defendant corporation is solvent. That is a crucial fact in this case. We are dealing with a solvent corporation and the controversy as to rights between the litigants is as to rights in a solvent corporation—not with respect to rights in an insolvent corporation.

The needs of the corporation in January, 1932, totaled approximately $93,000; some ninety-one odd thousand dollars for interest, some eighteen hundred dollars for income taxes, both items payable on the first mortgage. There being $25,000 on hand, there was therefore a deficiency in cash to meet the needs of approximately $70,000.

So much for the condition of the corporation with which we are dealing.

The next fact to be borne in mind, as a part of the background, is that the 261 Fifth avenue building was a joint enterprise. It was the creation, and all this financial structure had grown out of a creation, sponsored

by two groups, one of which I shall call the Thoens group and the other the Starrett group. That is to be kept in mind in considering the later facts in our effort to arrive at the proper weight to be given to the evidence. For the purpose of considering those two groups we need not go very far into details.

The defendant corporation originally issued and still has outstanding a total of 6,000 shares of the par value of $100 each. This was fully paid in; 1.625 shares were owned by Thoens individually; 1,625 by his partner, Flaunlacher—and during the period with which we are concerned by Mr. Flaunlacher's estate. Those two blocks of stock constituted a majority of the 6,000 shares. There were others associated with the Thoens group —their names indicating that they were members of the same family. That was the majority group. The Starrett holdings, 1,500 shares, the minority, are covered by a certificate that was issued and when suit was commenced still stood in the name of Starrett Brothers, Inc., which is not a party to this suit.

There are three Starrett corporations that have to be borne in mind. There was the parent company, the Starrett Corporation, and there were two wholly owned subsidiaries —the Starrett Investing Corporation, which is the second mortgagee, and Starrett Brothers, Inc., in whose name stood the certificate of stock for 1,500 shares. Mr. Vogt was the treasurer of the Starrett Corporation and of its subsidiaries. Mr. Walsh was vice president of the Starrett Investing Corporation. The executives of the three Starrett concerns, so far as the evidence disclosed, in immediate charge of them and with whom the dealings as executives were had on behalf of the defendants, were principally Mr. Vogt and, to some extent, Mr. Walsh.

What is chiefly assailed in this case—the thing around which the controversy centers —is a resolution passed at the stockholders' meeting of December 23, 1931. That resolution was to sell the building. What was the building? It was the assets of the defendant corporation. The resolution was, therefore, an authorization to sell all or substantially all the property of the defendant corporation. This litigation accordingly must be considered in the light of the fact that that is what was involved in the resolution. It proposed to dispose of the entire capital assets. This is not, in the sense of the statutes nor in the sense of the court decisions nor in the sense of business affairs, a transaction in

due or ordinary course. Consequently, there arises the problem as to whether or not the resolution of the stockholders to sell all or substantially all the assets of the corporation was lawful. Manifestly the very name of the defendant corporation itself, Fifth Avenue & Twenty-Ninth Street Corporation, is indicative of the fact, is indicative of the understanding on the part of everybody concerned, that the building at that address was the corporation from the standpoint of its property. There is no other rational meaning to attribute to the name.

Furthermore, this is made clear by the covenant in the first mortgage. That itself contemplates that the defendant mortgagee shall not have another building. That covenant is to run until 1948. The precise words in section 5 are: "The mortgagor" (being the defendant corporation) "covenants that it will not engage in any other business than the ownership and operation of the mortgaged property," and the mortgaged property is the building. It is plain therefore that sale of the building must constitute a complete abandonment of business by the corporation.

Within the Timmis Case, 200 N. Y. 177, 93 N. E. 522, taking that as prescribing the test, we are concerned here with a proceeding for the sale of all or substantially all the assets of a solvent corporation. It is in the light of that fact that we are faced with the question of whether or not the stockholders' resolution was valid.

█ It is perfectly manifest from the authorities—if not universally, then substantially universally—that, in the absence of by-law or statute to the contrary, under the general law there can be no valid sale of all the assets of a corporation without the unanimous consent of the stockholders. We are not much concerned, however, with the general law, save as a background for the consideration of the by-laws and of the statutes; but we start off with the background, which, if applicable, would be to the effect that without unanimous consent of the stockholders there could not be a valid sale of the building.

█ The by-laws are carefully drawn. I disregard for the moment any difference in them between an annual meeting and a special meeting. They make plain the intent that the object of a meeting shall be made known by notice in advance. Moreover, what might be done at any type of meeting in the way of routine or of ordinary affairs, as prescribed by the by-laws, is not sufficient to cover an

extraordinary thing like the sale of the entire property.

In article I, section 4, of the by-laws it is provided that "no business other than that stated in the notice of a stockholders' meeting, either regular or special, shall be transacted at such meeting without the unanimous consent of all the stockholders of the corporation in person or by proxy, except that the election of directors may be held and the reports of officers and committees made, received and acted on at the annual meeting of stockholders without special mention thereof in the notice of such meeting."

By virtue of this by-law there are three things, and only three things, an annual meeting might do without unanimous consent, in the absence of having been specified in the notice of meeting: (1) It might elect directors; (2) it might receive reports made by officers and committees; (3) it might act on those reports.

It is said by the defendants that Mr. Thoens made a report to the meeting on the building and with regard to a sale of it. It is argued that this report brought the subject of sale properly before the meeting, even though it had not been expressly mentioned in the notice of meeting. For the purpose of considering the point, let it be conceded that the meeting of December 23, 1931, was an annual meeting. In order to determine the meaning of the phrase "reports of officers," employed in section 4, article I, we must look elsewhere in the by-laws to ascertain who are the officers and what are their duties. Mr. Flaunlacher, the president, had died on June 5, 1931. Mr. Thoens was the secretary. He could make no report as president or for the president. He made a report, but that was in his capacity as secretary. The duties of the secretary are prescribed in article III, section 6. As there described, these are the usual duties of a recorder of the proceedings of the official bodies of the corporation and the incidents thereto. In no other respect were they executive; nor did they relate to the conduct of the business affairs of the corporation.

At an annual meeting any report by Mr. Thoens as secretary—a report by him within the province of a secretary as defined in the by-laws—could properly bring before the annual meeting, without notice, only such matters as are embraced within the requirements of the by-laws to be performed by the secretary; but there could not properly be brought before a meeting, without notice, by force of section 4, article I, any and every

kind of thing by mere importation of it into the report of a secretary—something that was wholly without the province of a secretary, as his functions and duties are defined by the by-laws. To interpret the by-laws as permitting, through the use of the phrase "reports of officers," the power to bring before the meeting for action, without previous notice to the stockholders, anything that he as an officer might choose, although it were entirely without the scope of his functions as defined by the by-laws, would so far leave the stockholders without protection and without a governing law that they would be put at the mercy of any officer. Such, as I believe, is not the meaning of section 4 of article I of the by-laws.

So, as I conceive it, under that provision of the by-laws, it would not be lawful for the secretary, and he would not be authorized by the device of embodying it in his report, to bring before the meeting, without prior notice to stockholders, the question of sale of the entire property of the corporation.

Article I, section 5, of the by-laws deals with stockholders' meetings without notice. It provides that "any meeting of the stockholders * * * may be held without notice, provided all of the stockholders * * * are present in person or by proxy, and at such meeting any business may be transacted." Assuming that the proxy with which we are concerned, and which will be commented on later, was comprehensive, general in terms, so far as concerns the Starrett stockholder—the Starrett Investing Corporation—the argument is that, being there present through that proxy, under this provision in section 5 of article I, which permits at such a gathering of stockholders the transaction of any business whatsoever, there could there be brought up and validly disposed of a resolution to strip the corporation of its entire assets. It is very questionable whether that is true, though it is not necessary now to decide the point. I take as undoubted that when all were present routine ordinary matters could be disposed of, without prior notice, at a meeting attended by all stockholders "in person or by proxy"; but even without resort to the statute which will be mentioned hereafter, it seems to me quite doubtful as to whether that is so with respect to a sale of the entire assets of the corporation—and it is with such a sale alone that we are now concerned.

Article VIII, section 1, of the by-laws deals with waiver of notice. It says this: "Whenever * * * the stockholders * * *

are authorized to hold any meeting after notice, or upon notice, or after the lapse of any prescribed period of time, such meeting may be held without notice or without any lapse of time, by a written waiver of notice * * * and any and all business specified in the waiver of notice may be transacted at such meeting."

Manifestly, unless in this instance the waiver of notice specified that the sale of the entire assets of the corporation would be taken up at the meeting, then a waiver in general terms would be wholly insufficient. To constitute an adequate waiver of notice it would be essential for it to specify that at the meeting the question of the sale of the entire assets would be taken up.

Having examined the provisions of the by-laws on the subject, let us turn now to the documents which it is relevant to consider in connection with them. There are three which are of consequence: The notice of meeting by the secretary, dated December 19, 1931; the waiver of notice of the meeting dated on its face December 18, 1931, but actually signed by the stockholder, Starrett Bros. Inc., on the day of the meeting, December 23, 1931; and the proxy dated December ——, 1931, but also signed on the day of the meeting.

To get at the real intent—certainly to get at the equities of the situation—it is necessary to consider all three of the writings together.

The notice, in the form of a letter from the secretary, said: "I consider it desirable that such a meeting" (that is, an annual meeting of the stockholders) "be held." Later it says: "At this annual meeting a complete Board of Directors should be elected. I enclose herewith waiver of notice of the meeting which please sign and return to me. * * * If you cannot personally attend the meeting, I enclose proxy which you may use and which I shall be glad to vote for you."

As the notice stood alone, certainly the emphasis was on the election of directors. A vacancy had been created in a directorship by the death of Mr. Flaunlacher. The office of president was also made vacant by his death.

The waiver is entitled, "Waiver of notice of special meeting of stockholders." The body waives notice of a "special meeting of stockholders" and thereupon consents that "the same"—that is, a special meeting of stockholders—be held "for the purpose of holding the annual meeting," not held in 1930 or 1931, "and for the purpose of electing at said annual meeting * * * direc-

tors of the corporation." Construing the waiver in the light of article VIII, section 1, of the by-laws, surely there is nothing in it that authorizes the taking up at the meeting —whether it be called annual or special—the sale of the entire assets of this corporation. That is the more clearly true in the light of section 31 of the General Corporation Law (Consol. Laws N. Y. c. 23), in connection with which article VIII, section 1, of the by-laws must be interpreted.

That brings us to the third paper. This authorizes Mr. Thoens "to vote as my proxy at a special meeting of the stockholders to be held on December 23, 1931, * * * and to vote thereat for directors." There is some room for taking two views as to the meaning of this proxy. It uses two expressions: "To vote as my proxy at a special meeting," and "to vote thereat for directors." The authority granted is defined and limited by the two expressions. It seems to me that, if reliance be based on the proxy, inasmuch as it is a power of attorney, it must be interpreted in the light of what it says on its face. This is that the agent is empowered "to vote as my proxy at a special meeting." Nothing is said in the proxy about an annual meeting. For that reason, as it further seems to me, in my view of the by-laws, there could not be imported into the special meeting under the proxy the right to vote on those things which the by-laws say can be voted on without notice at an annual meeting. However, it is not necessary even to determine that question.

It may be added only that, at best, it is extremely doubtful whether the notice, the waiver, and the proxy, considered singly or together, contain anything which would permit a vote on a sale of the building if the by-laws carried no qualification or limitation in or upon the clauses so far discussed.

Really, the case comes down, I think, to the statutes of the state of New York. The by-laws were written with care by the lawyer who framed them. With respect to both the annual meeting and a special meeting there are express limits as to notice. Sections 1 and 2 of article I of the by-laws, in substance and in effect, say that neither of them is designed to do away with the kind of notice required by statute. Section 1, article I, relating to the annual meeting, after prescribing that notice of a certain kind shall be given of the meeting, adds these words, "and such other notice shall be given as may be required by the statutes of the State of New York." Section 2, relating to special meetings, in the same way adds a clause at

the end, "and such other notice of each such meeting shall be given as required by law."

Prior to the enactment in 1893 of the statute now embodied in sections 20 and 21 of the Stock Corporation Law (Consol. Laws N. Y. c. 59), many difficulties arose between stockholders of corporations. Sometimes it was felt, and perhaps it was true, that the majority imposed on the minority. At other times, it was manifest that what was in the interest of a corporation, and perhaps in the interest of the minority stockholders, was prevented by a minority stockholder. To cure the situation, and to avoid those difficulties, as pointed out in the Timmis Case, 200 N. Y. 177, 93 N. E. 522, provision was made, as presently included in Section 20, whereby, with the consent of two-thirds of the stock, all the assets of the corporation can be sold. It is only under that section, as I conceive it, that here, without unanimous consent of the stockholders, there can be a valid sale of all of the defendant corporation's assets.

It is to be observed, however, that section 20 limits its operation. It expressly provides that, before such a sale, consent thereto shall be obtained at a meeting called as required by section 45. In turn section 45 prescribes written notice which shall state "the purpose or purposes" of the meeting. In view of the cross-reference from section 20 to section 45, if the purpose be to make a sale or to authorize a sale of the entire assets of a corporation, as I conceive it, in the absence of unanimous consent, then in order to bind all the stockholders by a two-thirds vote, there must be the kind of notice that is specified in section 45. That is notice "in writing" stating the "purpose" to vote at that meeting upon a sale of the entire assets of the corporation.

Counsel for the defendants rely upon the Timmis Case. As I understand, they construe it as holding that section 20 has no application unless there be embodied in the sale, along with all the tangible assets, the franchise as well. I do not so interpret what was there said. There a single department, although an integral branch of the corporation, was sold. Along with it was sold also the good will incident to the particular department. Because of the inclusion of good will along with the department, the corporation could not thereafter continue business of the type that had theretofore been carried on in that department. But here we have a corporation selling everything it has, which is a single building, and the corporation has committed itself by covenant—it is true, in

the first mortgage; but by a covenant running until 1948—in which it is expressly stipulated that it will not engage in any other business than the ownership and operation of this identical building, the mortgaged property at 261 Fifth avenue.

I do not see escape, therefore, from the conclusion that such a sale could not be validly authorized at a stockholders' meeting unless the requirements of sections 20 and 45 of the Stock Corporation Law were complied with; nor can I escape the further conclusion that those sections were not complied with.

There has been a good deal of testimony that is in conflict as to what occurred in the telephone conversations between the offices of Mr. Vogt and Mr. Thoens on the 23d of December, just preceding the convening of the meeting. There is no occasion, however, to determine the dispute. Taking the testimony of all the defendants' witnesses at its face, it fails to establish that, even orally, an unambiguous notice was given to the Starrett stockholder that at the meeting of that day the question of the sale of the building would be acted on or disposed of. At best it was but notice that the question might or would come up for discussion. That is the fair interpretation of the language as used by Mr. Baker and the language as used by Mr. Thoens and the language as used by Miss Byrne. There was no unequivocal or unambiguous notice given of an intention at the meeting to bring up the question of the sale of the building to be voted on.

It would be a dangerous, a very dangerous, loophole to leave in the law if all the provisions in the statutes and all the provisions in the by-laws as to written notice which I have mentioned could be flaunted and cast out of the window by oral proof; if, when a controversy arose, a jury or a judge could be asked to consider, as between the two contending sets of witnesses as to what occurred in telephone conversations, which has told the truth, and thereupon, if the jury or judge find that telephonic notice was served, the court could properly hold that all the property of a corporation had been validly disposed of. If such were construed to be the law, there would be left little safeguard of the rights of stockholders; the legislation of 1895 would have failed to accomplish its beneficent intent and, as I believe, perversion of it would be the consequence.

I think the design of the statute is to provide that what the defendants ask to have

sanctioned in the case at bar shall not be allowed. Accordingly, it is specifically stated in section 45 that the notice shall be "in writing." Written notice is the only safe basis for such a sale. It is the only safe plan upon which the affairs of corporations can be conducted, having in view the ultimate interest of stockholders and particularly of absent stockholders.

I am bound to say, on the testimony most favorable to the defendants, that there was not given—even in what was said on the telephone to him personally, if he answered the telephone, or to him through his associate Mr. Bingham—any fair or unequivocal notice to Mr. Vogt that at the meeting the question of authorizing a sale of all the property of the defendant corporation was going to be or that it was contemplated that it might be voted upon. It results that neither in writing nor orally was there notice that the business to be considered or acted upon at the meeting would include sale of the building.

■ There have been two meetings of directors, one on December 23 and one on January 28, at which the matter of the sale was dealt with. The directors, however, have no authority to sell the building. It is the stockholders whose consent is a prerequisite. What has happened at the directors' meetings in regard to the sale of the building was mere detail in order to carry out the sale, and it is of no consequence unless previously the stockholders had validly authorized the sale.

So, if there be no good defense set up and established, I shall hold in this case on the facts, and on the undisputed facts, that the resolution was wholly insufficient to authorize a sale of the building. Our next inquiry, therefore, will be whether the defendants have pleaded and proved any sufficient defense.

There are three contentions set up by way of defense in the answer.

■ First, it is said that the Starrett Corporation, the plaintiff, is not competent to maintain the suit. The facts are that the 1,500 shares of Starrett stock stood in the name of Starrett Brothers, Inc. The stockholder of record was Starrett Brothers, Inc. The waiver of notice and the proxy of December 23 were signed by Mr. Vogt in the name of Starrett Brothers, Inc. The proof is also, however, that in 1930 the Starrett Corporation became the owner of that stock. It was then received as a dividend from Starrett Brothers, Inc. From that date to the present it has been carried on the books of the Starrett Corporation as an asset.

Certificates of stock are nothing but evidence. There is something very much more real about stock than the pieces of paper. This stock became the property of Starrett Corporation in 1930. It has remained so ever since. Irrespective of where, according to the books of the defendant corporation, there were vested certain pieces of paper, these books were no obstacle to the Starrett Corporation by evidence establishing ownership. It is incontrovertibly clear that Starrett Corporation is the owner. It follows that it is entirely competent to come into this court to maintain this suit.

Under all the authorities, state or federal, Starrett Corporation has been both the legal and the equitable owner of the stock from 1930 down to date. True enough, so long as the real owner, Starrett Corporation, permitted Starrett Brothers, Inc., to continue its name on the stock book of the defendant corporation, Starrett Brothers, Inc., as the stockholder of record, had the right to give proxies and had the right to sign waivers. That was a matter of choice, however, on the part of Starrett Corporation. Starrett Brothers, Inc., was a wholly owned subsidiary; but it is entirely immaterial what was the reason of the parent for leaving the certificate in the name of the subsidiary or of the parent for taking the chance that the subsidiary might give an improper waiver or an improper proxy. That gamble could not in the slightest impair the title to or defeat the ownership of the stock on the part of the Starrett Corporation, unless, indeed, pursuant to papers signed by Starrett Brothers, Inc., something has been done which weakened the title.

No such question as that is being litigated in this case. We are now considering whether by what was done under documents signed by Starrett Brothers, Inc., namely, the waiver and the proxy, the title of defendant corporation to the building could be taken away from it or the complaining stockholder barred from objecting; but that is a very different question from the issue injected by the defense as to the ownership by Starrett Corporation of the 1,500 shares covered by the certificate standing in the name of Starrett Brothers, Inc. The stock belongs to the Starrett Corporation; but it holds the title subject to whatever may have been done by the record holder which may affect its interest thereunder. That plus the right of the defendant to pay it dividends is all the significance of the name of Starrett Brothers, Inc., being retained on the books as holder of the stock. The evidence does not disclose that anything has ever been done by Starrett

Brothers, Inc., designed to take away or that did take away the defendant corporation's title to the building as will appear by reasons assigned elsewhere.

There was only one difficulty as I conceived it while you gentlemen were arguing the question during the early part of the trial. That was whether or not in the absence of Starrett Brothers, Inc., as a party, this litigation was so framed that the defendant corporation was adequately protected as against some duplicate claim on account of the stock. In the course of the trial that possible defect has been entirely cured by the stock certificate being brought into court and here, in the courtroom, the stock transferred to the Starrett Corporation on the books of the defendant. The old certificate was surrendered, a new certificate was issued, and the new certificate now stands in the name of the Starrett Corporation. So the question of whether or not originally Starrett Brothers, Inc., technically should have been brought into the suit has been wiped out of the case.

The second defense is estoppel. That has given me a great deal of trouble. The doctrine of estoppel in pais, as it exists or as it is applied in courts of equity, is difficult; it is very difficult to apply correctly.

There has been some difference in the testimony of the witnesses on the subject of estoppel. It relates to what occurred between lawyers. I see nothing to criticize about them on either side. It is not necessary to determine whether one is right and the other is wrong about this or that or the other detail. When it comes to the only relevant facts, when it comes to the substance of the matter, as I conceive it, there is no genuine conflict between them. There is only the usual variance as to details and that may be disregarded.

What are the facts? The facts are that on January 20, 1932, Mr. Palmer—knowing that it was proposed that day to sign the sales contract whereby the Hibernia Trust Company would agree to purchase the building pursuant to the resolution of stockholders at the December 23 meeting; knowing that it was proposed to pledge that contract to the Underwriters' Trust Company and on the faith of that pledge the defendant corporation would borrow or hoped to borrow money from the Underwriters' Trust Company with which to meet the January installment of interest on the first mortgage—agreed to furnish an estoppel certificate in the name of the second mortgagee and said that if Mr.

Vogt would not execute the estoppel certificate, some other officer would.

Does that create an estoppel?

What has been described is a perfectly natural transaction between lawyers. It is the kind of thing that probably occurs every day in this town. There are two branches of the inquiry with which we are concerned in determining whether an estoppel exists and cuts off the Starrett Corporation from enforcing a right which, under what I have previously said, it would have to object to or to have set aside the sale of the defendant corporation's entire property, because of the unauthorized resolution at the December 23 meeting. These two branches are:

(1) What was the authority of Mr. Palmer?

(2) Conceding his authority, was what he did sufficient to create an estoppel or to be the basis for an estoppel?

Mr. Palmer was the lawyer for the Starrett Investing Corporation. He was a vice president of the plaintiffs. The witness did not say whether he was the only vice president. As matter of fact the proof is uncertain as to whether there were any other vice presidents of Starrett Corporation, but it is undisputed that Mr. Walsh was also a vice president of Starrett Investing Corporation. The whole thing has not been gone into, but I am inclined to think that there is nothing in the record to contradict that Mr. Palmer was dealt with solely as a lawyer. That is a usual way in which business affairs are conducted in this city every day.

Now, whatever we may think about it, as matter of law, a lawyer cannot bind his client prior to his becoming or being retained to become the attorney of record in a litigation.

If Mr. Palmer in the most unambiguous way had made an agreement on behalf of the plaintiffs, or on behalf of the Starrett Investing Corporation, it could have been repudiated by his client. In that connection read Stone v. Bank of Commerce, 174 U. S. 412, 19 S. Ct. 747, 43 L. Ed. 1028 (where also there was discussed the question of estoppel). Whatever the agreement, it is plain that it is worthless in so far as it rests on the authority of Mr. Palmer as a lawyer. Mr. Palmer as lawyer could not create an estoppel.

I see no escape from all the proof, certainly I feel very strongly, that Mr. Palmer was dealt with exclusively as a lawyer—precisely in the way lawyers deal with each oth-

er every day in this city. He was also a vice president; but there is no proof whatever as to the scope of duties of the several officers. In consequence, I feel that there is not enough to hold either plaintiff bound by what he may have promised as an executive.

Moreover, it is certainly true that from the inception of the building enterprise the man who had been dealt with by Mr. Thoens was Mr. Vogt. It was Mr. Vogt who had represented the Starrett stock. It was he who was asked to sign and who did sign the proxy and the waiver of notice. It was he who was looked to as the representative of the Starrett interests on the board of directors and until December 23, 1931, had been the treasurer of the defendant corporation. He was the treasurer of the several Starrett companies. I cannot escape the feeling that, as man to man, he was accepted and treated by the defendants as vested by the plaintiffs with executive control of their affairs in their relations with the defendants. It was he whose signature on the estoppel certificate the defendant corporation desired. It seems to me, therefore, upon the entire proof that nothing was better understood than that, as between each other, the parties deemed the executive end of this thing, so far as concerns the Starrett interests, to be in the hands of Mr. Vogt. This fortifies my feeling that Mr. Palmer was dealt with exclusively in his capacity as a lawyer.

Let us examine the matter, however, in its other aspect. Assume that Mr. Palmer was the vice president; assume that as such he was authorized to act and did act on behalf of the corporation for which he purported to act. Was estoppel created?

Certainly, so far as concerns the promise of an estoppel certificate, it was to be an estoppel certificate signed by the Starrett Investing Corporation. Concede, for the sake of argument, that the promise would estop that company. Would it also estop the Starrett Corporation? Would the promise by a subsidiary to furnish an estoppel certificate estop the parent company? Would such a promise by a second mortgagee estop a stockholder? I think not; at least it is very doubtful.

Again, bear this in mind: We are not concerned with the Hibernia Trust Company or what it did, nor with the Underwriters' Trust Company or what it did, nor even with Mr. Thoens or with what he did, nor with his indorsing the $100,000 note to the Underwriters' Trust Company. The negotiations between Mr. Palmer and the lawyers for the defendant occurred earlier in the day of January 20 than the execution of the sales contract, the loan of an additional $70,000 by the Underwriters' on the lodgment with it of a check for the down payment and the contract as collateral, and the indorsement by Mr. Thoens of a note for an amount including the $70,000. Our only inquiry, arising out of all these facts, is whether this established an estoppel in favor of or running to the defendant corporation. Has it proved a good defense?

As I conceive the law to be established by the authorities, both in the Court of Appeals of New York and in the Supreme Court of the United States, there is no basis whatsoever for maintaining that the action of Mr. Palmer constituted an estoppel unless by means of that action the defendant corporation was induced to enter into the sales contract and to do the other things following which have been mentioned. Upon that point I think the proof is adverse to the defendant. I think there was no inducement of the defendant corporation. It was ready and willing to enter into the contract and to procure the bank loan, regardless of whether the second mortgagee furnished or promised to furnish an estoppel certificate. It was not reliance upon the agreement of the second mortgagee to execute an estoppel certificate at a future date that led defendant corporation to do anything. Without the agreement it would have signed the contract and obtained the loan, if it could have done so. Moreover, I think the evidence affords adequate basis for believing that the sales contract would have been executed by both parties thereto even if the second mortgagee had refused an estoppel certificate.

The negotiations for the sale of the building, gentlemen, whatever the details may be, were negotiations that commenced in October, 1931. There is testimony about the letter of early January; about the Hibernia having withdrawn from the transaction; about this, that, and the other. In all this, however, there is nothing except what we are all familiar with in negotiations. It is the ordinary incident of trading. The Hibernia Trust Company had been the prospective purchaser and the negotiator throughout. It was a mere typical instance of going forward a little, drawing back and then resuming the advance movement, with a variety of steps, from October, 1931, to January 20, 1932. The Hibernia Trust Company was engaged in its own way, and a very proper way, in negotiating for the acquisition of the

property. The resolution had been passed on the 23d of December, 1931, authorizing a sale of the property; and I am convinced, as matter of inference from all the facts and circumstances, that the conduct of Mr. Palmer was no essential part of what led up to the contract being signed and certainly was not the inducement to the defendant corporation to sign the contract or to do any of the other things done by it incidental thereto.

■ I have said to you gentlemen· quite frankly that the question of estoppel had given me great concern. I have examined the authorities and from them, on another phase, there seems to me to emerge a principle, of universal application in courts of equity, in regard to the doctrine of estoppel in pais. It is that unless manifest injustice would result from refusal to enforce the estoppel claimed, a court of equity will not enforce it. In the first place, there must be injustice; in the second place, it must be manifest. It is to be borne in mind that the branch of the controversy now under consideration is that between the stockholder and his own corporation; between the Starrett Corporation, on the one hand, and the Fifth Avenue & Twenty-Ninth Street Corporation, on the other. Confining ourself now to that issue, I am persuaded that, from declining, on the plea of estoppel, to stay the stockholder from enjoying what would otherwise be an enforceable right, injustice is not manifest.

We shall come to another branch in a moment in which I shall discuss all the facts. In order to determine whether there would be injustice of the type mentioned, we shall have to go over the whole situation; but I will say briefly this now: Here were two groups of people that had been engaged in a joint enterprise since its inception. The whole management for one group had been in the hands of Mr. Vogt. On the day the sales contract was signed he was looked to, as for years before he had been looked to, as the representative of his group. On the statement of the lawyer for the group as to what would be forthcoming in future from the second mortgagee, this court is asked to hold that the making of the statement by the lawyer wipes out the right of the stockholder to object to the sale. On that restricted view of the facts, certainly it is not manifest to me that it would be an injustice to the corporate defendant to decline to employ estoppel as a means of shutting off such a right.

■ I repeat that in this connection we are not dealing with what might be said by Mr. Thoens or with his indorsement or with what might be said by the Hibernia Trust Company in regard to the upsetting of the contract or with what might be said by the Underwriters' Trust Company in regard to having made the loan. The Hibernia Trust Company and Underwriters' Trust Company are not parties to this litigation. The defendant corporation cannot set up their rights. It cannot raise an umbrella over its person by pleading something that affects other concerns, like the two trust companies, or Mr. Thoens.

· I conclude, therefore, that estoppel is not established.

■ The third defense set up is that, even though the stockholder plaintiff have rights, the remedy at law for their breach is · adequate. Substantially this comes down to the contention that the only remedy a stockholder has when a sale has been made over his objection or is about to be made over his objection is to have his stock appraised.

Under the statute of 1893, as now embodied in sections 20 and 21 of the Stock Corporation Law, a stockholder may attend a meeting of which he has had full notice, protest, vote against a proposed sale of the entire assets, be overruled by a two-thirds vote at the properly called meeting, then and thereupon—despite his having been overridden by a two-thirds vote—he is entitled to have his stock appraised if he wants to. That is not this case. This is a case where, upon the conclusions of fact which I have stated heretofore, there is nothing binding; there was not requisite notice. It is only by procedure in strict accord with sections 20 and 45 of the Stock Corporation Law that a dissenting adverse stockholder can be put to appraisal as his only remedy.

I cannot say whether if this sale be upset the outcome will be good or bad for the plaintiff. It would be purely speculation to attempt to measure what the effect would be, so far as the dissenting stockholder is concerned. There may never again be as good a chance to sell the property. I do not know. But it is not within the province of the court to determine; it is none of the court's business.

The plaintiff stockholder has a right, a plain right. There is no way of finding out whether or not the value which he would get by an appraisal would be an adequate value or whether the remedy afforded by appraisal would be an adequate remedy. In those circumstances the stockholder is entitled to a remedy in equity.

Up to this time, so far as concerns the right of the complaining stockholder, I have examined the rather narrow ground as to whether or not the procedure in conducting the corporate transactions was in such form as to bind him, so that he must abide by the vote that was cast by the majority stockholders at the meeting of December 23, 1931.

There are certain general facts, though, which have to do with the equities of the case and which put the case on a broader ground. These should have additional consideration. I have weighed them as best I could and I have listened to the arguments. I think they lead to the same end as that already stated under the rather restricted view of the law that has been discussed.

The bill in substance charges fraud in fact. There is a good deal of conflict in the evidence. Certainly a great many diverse inferences could be drawn from it. I see no occasion really, however, for convicting or acquitting anybody of fraud in fact. There is certainly no necessity for determining the issue. On the other hand, there is a further phase of the general facts that is of consequence. Ignoring the issue of fraud in fact, the other phase has a vital bearing on the rights of the parties.

In the decisions of the Court of Appeals of this state and of the Supreme Court of the United States, great emphasis is laid upon the existence of what is tantamount to a fiduciary duty owing by majority stockholders to minority stockholders—not technically fiduciary, to be sure, but fiduciary in the sense that there must be fair dealing and that there must be fair dealing irrespective of what the intent may have been.

The Court of Appeals, in Farmers' Loan & Trust Company v. New York & Northern Railway Company, 150 N. Y. 410, 44 N. E. 1043, 1047, 34 L. R. A. 76, 55 Am. St. Rep. 689, used two expressions which are pertinent. It was said, approving an earlier decision: "The majority," being the majority stockholders, "may legally control the company's business, but in assuming such control, they take upon themselves the correlative duty of diligence and good faith; and * * * they cannot manipulate the company's business in their own interests to the injury of the minority stockholders." Again, the court quoted approvingly this statement from Cook (2 Cook, Stock, Stockh. & Corp. Law (3d Ed.) § 662, p. 945): "The law requires of the majority of the stockholders the utmost good faith in their control and management of the corporation as regards the

minority, and in this respect the majority stand in much the same attitude towards the minority that the directors sustain towards all the stockholders."

There are two groups of stockholders. The majority hold $163,000 of notes owing by the defendant corporation. I say this with the explanation already made in regard to the $30,000 note to Thoens & Flaunlacher, Inc. In substance and effect the sale of the building was an abandonment of the enterprise. The two groups had been working together throughout, the one having done the construction and the other having carried on the management. What happened? Out of the sale, subject to but without assumption of the mortgages, there would come $290,000 in cash. It would take $100,000 of this to pay the Underwriters' Trust Company. The stockholders' notes could absorb $163,000. If so, that would leave $27,000—the result of deducting $263,000 from $290,000. The $27,000 would be available for distribution upon $600,000 par value of the stock. That would be at the rate of $4.50 a share. That is what could happen. Another thing that could happen also was extinguishment of the Hibernia lease.

The corporation was solvent. It had refused to accept temporary reduction of rates of rental in order to fill vacant space. Acceptance of the lesser rates available, according to the testimony, would have supplied more than enough additional income to meet the deficiency in current needs. Mr. Vogt had been dealt with throughout as the representative of the minority stock. The sales resolution was adopted without notice to him; without contemplation by him that it would be acted on at the meeting—at the meeting for which he signed a proxy to a large holder of the note indebtedness. Whatever may be the explanation—and I am not charging bad faith in the sense of fraud in fact—the obvious and indisputable circumstances stand out. Their effect cannot be escaped. The very assembly of a meeting, composed in the way and having individual interests as creditors of the kind described, cast upon it and carried with it the obligation to exercise great care to safeguard the minority; to treat the minority fairly. What followed adoption of the resolution? Was prompt information furnished the minority as to what action had been taken at the meeting? It is not denied that in advance such information had been promised; nor is it denied that there was substantial delay in communicating with the minority. Explanations are made. I may call them reasonable

explanations. Nevertheless, the fact is that Mr. Vogt, who had been dealt with throughout as the representative of the Starrett interests, although he had been explicitly promised a copy of the minutes, was kept in ignorance for about three weeks, from the date of the meeting on December 23 until he learned on or about the 13th of January from an outsider some of the things that had taken place at the meeting, and it was not until the 14th of January that he received a copy of the minutes, and when he got a copy of the minutes, they were not complete.

I entirely credit the explanations given by Mr. Baker. I acquit him entirely of any fraud in fact. But, gentlemen, when it comes to the result, it is just the same as if the delay had been intentional.

The bill was verified January 25. The present suit was commenced on January 26. Under the circumstances, that was prompt action by the dissenting stockholder. There was no laches. None is asserted. Only estoppel is claimed. That is rested wholly on what occurred on a single day and on what occurred that day with Mr. Palmer. The day was January 20, the day the sales contract was signed. The suit was brought within less than a week thereafter.

The suit assails what was done by the majority as unfair and as such a fraud in law. Under the rule laid down by the New York Court of Appeals and by the Supreme Court of the United States, when the majority group of stockholders assembled and approved an arrangement whereby it could absorb $163,000 out of the $290,000 net from the sale of all capital assets, it put itself under a very grave burden; it assumed the duty to exercise the utmost care toward the minority who were absent—particularly when one of the chief beneficiaries of the distribution of the $163,000 would be the identical person who had been intrusted by the absent stockholder with power of attorney to vote the minority stock.

So, under all the circumstances, as I indicated in connection with the discussion of estoppel, I feel bound to say that I do not think what occurred was fair dealing.

The case, however, is still stronger for the complaining stockholder. I think it would be enough to invalidate the resolution that it created the danger about which I have been talking; that it put the minority stock in such peril and left its interests so helpless. When, in addition, we consider all the circumstances respecting and surrounding the resolution, I see no escape from the conclusion that it was the intention to distribute the $163,000 to the majority stockholders, nor the conclusion that it was the purpose to extinguish the Hibernia lease, nor the conclusion that it was the intention to abandon the enterprise. If that be so, it is precisely the kind of thing that equity is vigilant, and it is the duty of a court of equity to be vigilant, to protect against. It is what is in law, it is what is in view of what is laid down by the Court of Appeals, as I have quoted it, a fraud; what is called constructive fraud. It is a fraud in law even though there be no bad intent on the part of those engaging in it and even though there be no fraud in fact as that term is employed by way of contradistinction. Because of the relations between the parties and the duties toward each other growing out of those relations, it is fraud in law.

So I conclude that the Starrett Corporation, the stockholder plaintiff, is entitled to relief in this case. If it be entitled to relief, that would necessarily include setting aside the resolution authorizing the sale of the building passed on December 23, 1931, and would likewise include all the progeny or incidents of that resolution in the way of directors' action or otherwise and all contracts or conditions resting on the resolution.

We might end the case here. I shall, however, go on to the further inquiry as to the rights in what I shall refer to as the second suit—the suit by the second mortgagee. I shall dispose of that rather briefly.

Bear in mind, gentlemen, that we are dealing with capital assets. Bear in mind also that, while the plaintiff in the second suit is a second mortgagee, it is a creditor of the defendant corporation. It was in order to clarify that point that near the beginning of the trial I asked whether a bond was given to the second mortgagee. A bond was given and the principal of the bond is wholly unpaid. The second mortgagee being a creditor, it has the rights of a creditor. Moreover, it is a creditor with a lien on the physical assets of the defendant corporation, subordinate, of course, to the lien of the first mortgage, but nevertheless it is a creditor with a lien.

What was the purpose of the resolution and what would have been the result of the sale? The answer is inescapable. The purpose was to syphon out, and the result would have been to syphon out, from behind the second mortgage all or a certain portion—it matters not which—of the capital assets of the mortgagor. These capital assets were to be converted into cash and to be placed in a form where the directors could devote them

to the payment of general debts of the corporation, if they saw fit. In the absence of a default in the mortgage—lacking the right to institute a proceeding to foreclose—the remedy of the second mortgagee is to come into court seeking a decree to stop the sale and to stop the continuance of a situation whereby the capital assets could be taken from behind its mortgage. If the second mortgagee were to remain dormant or were not afforded relief, the second mortgage, by the date default shall have occurred and the right of foreclosure shall have accrued, might have become mere waste paper. True it would have remained a lien on the building; but the proposed purchaser of the building does not assume to pay it, and, the Hibernia lease having been extinguished, nobody can say whether the building would be sufficient, after discharge of the first mortgage, to meet the second mortgage. As a creditor with a lien, the second mortgagee is entitled to protection against diversion of capital assets which would subject it to the risk.

We do not have to go into the details of the provisions of the mortgages—either first or second—to determine what is the right of a creditor with a lien in the only respect which is material. The assets of the corporation are a trust fund for creditors. Creditors with liens have a right to come into a court to prevent the creation of a situation where, when their liens mature and become enforcible, there will be left nothing but a wreck.

So, also, we need not go into all the interesting discussion at the bar about the various provisions of law affecting rights related to assignments of rent. Look at the actual situation. What is it? Here we have a real estate corporation. It has no income except from rents. One of its principal tenants is the proposed purchaser of the building. The purpose of the purchaser—it may be a proper purpose, but it is nevertheless an obvious purpose—the purpose of the Hibernia was to extinguish its lease. It is equally clear that, without filling a great part of the vacant space, the balance of the rents would be inadequate to meet carrying charges; and to date the managers of the property have been unwilling to fill the space at the rates available therefor.

Whatever may be the rights with respect to the lease or as to assignment of rents or as to all the provisions in the contract affecting the lease or the rents, here is an enterprise dependent solely upon getting an income from the leasing of space in the building; here is a prospective purchaser paying a stipulated rate of rent; under the proof it is a practical certainty that now, and probably for a long time in the future, no lease of the same space to another person could be made at any such rate. That lease runs until 1950. It brings in an income which approximates the difference between the income from other sources (even though vacancies continue as at present) and carrying charges, including service on both mortgages. The second mortgagee has an obvious interest in protecting its lien against the hazard which would surely follow from extinguishment of the lease. This circumstance supplements what has been previously said about the rights generally of a creditor with a lien. In view of the situation created by and pursuant to the resolution, with respect to putting it in the power of a board of directors to divert $163,000 of capital assets to general creditors, it seems perfectly manifest to me that the second mortgagee, if it desires, is entitled to have the situation as it existed preceding the resolution, held in statu quo unless some provision be made for it as a creditor with a lien. We cannot disregard the creditor with a lien. A court of equity should protect the second mortgagee against the peril.

We do not have to be assured, by a directors' resolution or otherwise, that the $163,000 would be distributed to the general creditors if the transaction embraced in the sales contract were consummated. It need not be proved to a certainty that, if the contract stand, the Hibernia Trust Company will extinguish the lease; although, as already stated, I think both the payment of the $163,000 and the extinguishment of the lease would happen. Equity will protect the creditor with a lien from the situation being created where his rights would be so imperiled, for the very reason (among others) that, as there has been no default on the creditor's mortgage, he cannot proceed to foreclose.

Next, was the second mortgagee estopped?

I shall not go into that question at any great length. The only differences with respect to estoppel between the situation of the stockholder and the situation of the second mortgagee are two: First, the second mortgagee is the corporation whose name Mr. Palmer promised to have signed to the estoppel certificate; and, secondly, Mr. Walsh had to some extent participated in the management of the affairs of the second mortgagee. I think that the argument against estoppel is perhaps less clear so far as concerns the second mortgagee than as against the stock-

882

holder. In case of the stockholder I have little doubt that there is no estoppel. Possibly, the fact that the plaintiff in what we have called the second suit is the identical corporation whose name Mr. Palmer agreed to have signed to the estoppel certificate would make the argument for estoppel stronger than in what we have called the first suit; but even with the single difference being taken in its favor, it does not seem to me that the defendant corporation has made out its defense of estoppel. There are the same deficiencies in regard to Mr. Palmer having acted as a lawyer only, proof being lacking as to his executive authority, his having merely made a promise as to what he would cause to be done at a later date, the promise not having been the real inducement to the defendant corporation in executing the sales contract or in getting the loan and the insufficiency of the showing that injustice would ensue to the corporate defendant if the court should decline to treat what Mr. Palmer did as a bar to the second mortgagee enjoying what but for his promise would, as I feel, be its plain rights. I content myself with merely adding that for reasons which I gave in connection with the first suit I do not think an estoppel is established in the second suit.

Lastly, it is contended by the defendants that the second mortgagee is not entitled to maintain the second suit because of the pledge of the second mortgage under the mortgage to the Bank of Manhattan Trust Company as trustee. In one way the pledge is all the more reason why it is the duty of the second mortgagee to bring this suit. It is the pledgor. It is obligated to protect the pledge. It has title. The transfer is nothing but a pledge. The second mortgagee has not lost property interest in the second mortgage at all.

I conclude, therefore, with respect to the Starrett Investing Corporation, that it also is entitled to relief.

What should be the relief?

First, both plaintiffs are entitled to an injunction against the carrying out of the sale or of the sales contract or of the resolution of the stockholders of December 23, 1931, authorizing the sale, including the portion of it dealing with brokerage, which is a mere incident.

Secondly, both plaintiffs are entitled to an injunction against the carrying out of the votes of the directors on December 23 and January 28 that were details for accomplishing the plan contemplated by the stockholders' resolution.

Third, they are also entitled to an injunction against Mr. Thoens to the same end. As an officer of the corporation, being now its president, but due likewise to his predominant position in the situation and his activity in the transactions, the injunction should run against him individually also.

So far as concerns the failure to re-elect Mr. Vogt treasurer of the defendant corporation, no right of either plaintiff in that respect has been breached. Moreover, construing together all three of the relevant papers (the notice of the stockholders' meeting, the waiver of notice of the meeting and the proxy, two of which were signed by Mr. Vogt), in conjunction with the by-laws, including the one fixing a date for holding the directors' meeting immediately following the annual meeting, I think a layman reading these papers the way Mr. Vogt had them presented to him—if he had acquainted himself with the by-laws, as it was his duty to do— was fairly apprised by the documents that, the meeting of December 23 being for the election of all the directors, a meeting of directors would follow on that day. I shall therefore not give an injunction as against so much of the proceeding at the directors' meeting of December 23 as failed to re-elect Mr. Vogt treasurer.

I think the plaintiffs are not entitled to have this court inject itself into the conduct of the internal affairs of the defendant corporation. I see no occasion, therefore, to go into all the matters, the various other matters, as to which the plaintiffs have asked relief. They are comprehended within internal management and, on that account, they appear to me to lie outside the domain of what the court should undertake to control.

My statement has been rather discursive and rather lengthy. As I have told you, I tried to keep my mind open on all the main points until you had completed your arguments. It has been an interesting case. I am not sure that on all points I am correct, although I say frankly that on the main points I feel strongly that the result is right.

I am going to enjoin the resolution of December 23, which I consider absolutely void, and everything dependent on it. Otherwise, I think I should leave the parties free to look out for or thrash out their own difficulties. It is not the business of the court to inject itself into running the internal affairs of a corporation. So far as concerns the rights of either of the plaintiffs which have been interfered with, they all go back to the resolution of December 23, as I see it, and if I

cut out that basis, cut out the resolution, invalidate the resolution with everything that has followed from it, including the sales contract, I have given you complete relief.

Settle decree on five days' notice.

### Supplemental Opinion.

In addition to the relief awarded at the trial, I think the plaintiffs are entitled to have the defendants enjoined, during the life of the second mortgage, from canceling, surrending, assigning, or otherwise disposing of the Hibernia lease, except on the prior written consent of the second mortgagee; provided, however, that if the defendants or either of them in writing request and fail within a reasonable time to obtain such consent, then, on five days' notice to the plaintiffs, the defendants or either of them may apply at the foot of the decree for modification of or release from this clause on such terms or conditions as the court may prescribe.