**LANGDON–WARREN MINES, Inc., v. REYNOLDS, Collector of Internal Revenue.**

No. 695.

District Court, D. Minnesota.
Fourth Division.

July 9, 1943.

Leland W. Scott and John W. Windhorst (of Dorsey, Colman, Barker, Scott & Barber), both of Minneapolis, Minn., for plaintiff.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe and Homer R. Miller, Sp. Assts. to the Atty. Gen., of counsel), for defendant.

NORDBYE, District Judge.

Plaintiff, as sole distributee of the assets of the Pine Land Company, which was dissolved in 1939, is suing for a tax refund; of $34,403.43 plus interest from 1938. This sum represents the amount of a deficiency income tax which the Commissioner of Internal Revenue assessed against the Pine Land Company on its income for 1938, and which plaintiff, as sole distributee, has paid. The parties to the action agree that the plaintiff's rights to a refund depend upon the rights which the Pine Land Company had in 1938.

The facts upon which the case turns appear to be the following: In 1905, the Pine Land Company acquired a one-half interest in the Bruce iron ore mine on the Minnesota Mesabi Range, but no mining was done until 1925. About seventy drill holes were made prior to 1921 for the purpose of testing the ore. The results of these drilling operations were included in a Form D (Defendant's Exhibit A) which the Pine Land Company submitted to the Bureau of Internal Revenue in February, 1921, as a basis for determining the value of this mineral land for depletion purposes and its cost. In this Form D, the company declared that the total value of the property was $2,283,346.80 and estimated that the properties contained 12,685,262 tons of iron ore as of December 20, 1905.

The Bruce Mine was leased to the International Harvester Company on March 30, 1920. By the lease, the Harvester Company agreed to pay the lessors (Pine Land Company owned the property with three other companies) a specified yearly royalty upon the tons of ore removed. It further agreed to pay the lessors $250,000 as compensation for various expenses they had incurred with respect to the mine since 1900 and that the yearly royalties would equal a specified minimum.[1] The Harvester Company operated the mine until 1938. On January 14, 1938, the Harvester Company cancelled its lease, as the lease permitted, upon six months' notice; so by July 18, 1938, the Harvester Company had removed all of its property, including the buildings, sintering plant, and all the mine equipment both above and below the ground, and the lease had terminated. The shaft was sealed.

The Pine Land Company deducted $719,963.66 from its income tax for 1938 as a loss sustained, contending that the mine became worthless that year and was aban-

[1] Subsequent changes in this agreement are immaterial here.

doned by the plaintiff. The company's books were kept, and its income reported on a cash receipts basis. The mine has not been worked since that time and the taxes have not been paid. The Board of Directors of the Pine Land Company passed a resolution in December, 1938, that the company was abandoning the mine, and that resolution was approved by the stockholders in January, 1939.

The Commissioner refused to permit the entire deduction and assessed the deficiency tax in question, basing his action upon the following premises:

(1) That the mine had value even after the cancellation of the lease by International Harvester Company, and there was no abandonment thereof by the taxpayer in 1938.

(2) That the $125,000 paid to Pine Land Company by International Harvester Company from 1920 to 1924 was in the nature of advance royalties, and $107,135.50 thereof was attributable to income for 1938.

(3) The amount of ore upon which International Harvester Company paid royalties under the minimum royalties agreement, and which it did not mine, cannot be considered depletion, and the royalties received therefor must be charged to the 1938 income.

Plaintiff takes issue with the Commissioner's premises and resulting conclusions. Therefore, their correctness becomes the issue of this case. Plaintiff and defendant agree that if the Commissioner's first premise is erroneous and plaintiff's contention that the Bruce Mine was worthless is correct, then the second and third premises and issues become moot, for the deductions permissible, if the determination of the first issue favors plaintiff, would be greater than the amount due if the remaining issues are determined favorably to defendant.

■■ Section 23(f) of the Revenue Act of 1938, 26 U.S.C.A. Int.Rev.Code, § 23(f), is the applicable statutory provision. It declares:

"In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(f) Losses by corporations. In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

Article 23(e)–3 of Regulations 101 provides: "When through some change in business conditions the usefulness in the business of some or all of the capital assets is suddenly terminated so that the taxpayer discards the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis (adjusted as provided in Sec. 113(b) and Articles 113(a) (14)-1, 113(b)-1, 113(b)-2, 113(b)-3) and the salvage value of the property."

To deduct a loss under this section, the taxpayer must prove (1) that the loss was realized or reasonably certain in fact and ascertainable in amount during the year for which it is deducted, Lucas v. American Code Co., 1930, 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010, and (2) that the loss became fixed by an "identifiable event." United States v. S. S. White Dental Co., 1927, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120; Dayton Co. v. Com'r of Int. Rev., 8 Cir., 90 F.2d 767. These are fact questions, Rhodes v. Com'r of Int. Rev., 6 Cir., 100 F.2d 966, Dayton Co. v. Com'r, supra, upon which the taxpayer bears the burden of proof. Dayton Co. v. Com'r, supra.

■■ At the outset, it may be observed that: "A definitive sale of property is not required, and even in the absence of a divestiture of legal title a taxpayer may be considered in a very practical sense to have abandoned real estate." Bickerstaff v. Com'r of Int. Rev., 5 Cir., 1942, 128 F.2d 366, 367. In contending that the mine was worthless in 1938, plaintiff largely relies on the testimony of C. J. Calvin and Frank M. Warren. Mr. Calvin was the engineer on the job for the Pine Land Company and the other fee owners of the Bruce Mine. After the International Harvester Company cancelled the lease, he made a survey to determine the condition and value of the mine, and reported to the owners that the mine could not be operated profitably and stated that, in his opinion, it would never be operated again. This report is identified as Exhibit 2, and while it was not formally offered in evidence, the Court has determined that it should be, and is now, received in evidence in that it establishes the information which came to the Pine Land Company regarding the situation with respect to this mine, and therefore it is material in so far as it may have a bearing upon the bona fides and finality of

the acts which the Pine Land Company assumed to take in connection with the abandonment of the mine. Calvin's familiarity with the mine began about 1921, and during its entire operation by the International he was on the property, carrying on engineering and inspection work. It would appear that, not only was he a competent mining engineer, but no person was better equipped by reason of his familiarity with the mine to express an opinion as to its condition, worth and value, and the feasibility of resuming mining operations after the cancellation of the lease. Mr. Warren was an officer of the Pine Land Company and also an officer of the plaintiff herein. He is a graduate mining engineer and has had a long connection with the iron mining industry on the Mesabi Range.

In support of its position that the mine had value in 1938, the defendant called two witnesses, William C. Gordon, a mining engineer employed by defendant and undoubtedly qualified to express an opinion regarding iron mining operations in general, and Ernest W. Johnson, a mining engineer of considerable experience, with a long acquaintance with mining operations on the Mesabi Range, but with no direct knowledge of the situation in the Bruce Mine. He had been employed, however, by the Minnesota Tax Commission, and in connection with that employment had become familiar with the operations of the mine in so far as they pertained to ad valorem taxes.

The mine contained three types of ore: direct shipping ore, manganiferous paint rock, and wash ore. Direct shipping ore is ore that can be mined without any treatment. Manganiferous paint rock contains a certain amount of manganese and some aluminum. Wash ore is ore from which the free silica must be readily removed so that the ore which is shipped does not have too large a silica content for use in the furnaces. The silica is removed by a washing process for which special equipment is necessary. Manganiferous ore found in this mine contains about 40% fines, but the ore was desirable in that it tended, whenever mixed with iron ore, to produce a more even flow when going through the furnaces. However, in order to utilize the manganiferous ore, sintering is necessary. Sintering is a process through which the manganiferous ore is put so that it will agglomerate in small porous pieces. This process remedies the difficulties resulting from the fact that the ore contains such a per cent of fines. In 1930, the International erected a sintering plant for the treatment of this ore at a cost of some $250,000.

The wash ore available in the mine, according to Mr. Calvin, could not be mined, concentrated, and marketed for an amount equal to the cost of production and treatment. It appears that this ore would yield about 60 tons of merchantable ore for every 100 tons mined. In addition to the cost of mining this ore, the operators were required to erect a concentrating plant and tailings basin. The concentrating plant is so constructed as to remove the free silica from the ore, and the tailings basin is arranged so as to prevent the silica and other waste products from flowing on to adjacent property.

It appears that the mining operations in this mine were commenced by International on November 2, 1925. The mine covers in surface area two forties. In 1926, development was commenced in the 700 foot level. In 1934, development was commenced below the 700 foot level, and when the 558 foot level was reached, water was struck in excessive quantities, resulting in serious cave-ins which filled in a large part of the drift. After some attempt at clearing the drifts and resuming operations at this level, International concluded that it was too hazardous and difficult, and operations therein were abandoned. However, it did proceed with operations in the 614 foot level, which continued from about 1936 to 1938. The early drill hole records, as reflected in Form D, indicated a substantial tonnage of direct shipping ore at this level, particularly near and on the north forty, but when that ore body was reached it was found to contain an excessive amount of fines. That is, the ore was so fine or pulverulent that 25.80 per cent of it would pass through a 100 mesh screen—a screen which has 100 squares to the lineal inch. Apparently, such ore is objectionable because it has no market, due to the fact that, when it is put in a furnace for smelting purposes, too great a per cent of the ore escapes from the flues. It is therefore not acceptable to the industry. Calvin testified that any ore which is more than 10 or 10½ per cent fines is poor structure ore. In addition, when the International went below the 700 foot level, it found that the ore was confined to rather narrow troughs. The original estimates assumed that the ore

extended from drill hole to drill hole, but actual operations proved this assumption erroneous. Consequently, in 1937 International had exhausted the available ore above the 700 foot level. It appeared that it was impossible to remove the ore below the 614 foot level because of excessive water and other difficulties. While the 614 foot level contained valuable direct shipping ore, it was commercially nonprofitable because of the fines and because of the limited quantities. Moreover, operations in connection with producing the manganiferous paint rock did not prove profitable. According to Calvin, the cost of sintering this ore was $1.40 to $1.75 per ton, and in light of this cost the operations would be unprofitable. In addition, the cost of putting the crude wash ore through the concentrating plant made it impossible for the wash ore to be mined, concentrated, and sold at the cost of production.

It is quite apparent that, when International began to operate this property, it did so with the purpose of exhausting all of the available ore that could be produced profitably. The improvement of the property, the surface and underground equipment, the shafts and other extensive apparatus, all pointed to a long-lived operation. The expenditure of some $250,000 for a sintering plant alone indicates the intention of the lessee. While there is no direct testimony as to all of the reasons which may have prompted the International to cancel the lease, the record fully supports the view that it found that the entire operation was unprofitable. It is clear that there was a marked reduction in the amount of the expected direct shipping ore as compared with the estimated amount when the drill holes were made, as indicated by Form D. Then, the fines of the direct shipping ore which could be extracted made it commercially unprofitable. In addition, the other ores could not be mined at a profit, and although substantial expense had been incurred by International during the years of its operation, it concluded in January, 1938, to cancel its lease. The results of the abandonment of the mine by International is graphically summed up in the testimony of Mr. Warren: "The International Harvester Company is as good an operating company as there is on the Mesabi Range. The International Harvester Company conducted that mine as well as it was possible to be conducted. At the time that it surrendered the lease, or gave

notice of surrendering the lease, the mine was in perfect operating condition, as possible to have it. Upon surrender of the lease, the mine began—when pumping was stopped the mine began filling with water. That mine is an unusually wet mine, as evidenced by the almost impossibility of continuing on the 528 foot level, after they struck that rush-in of water and sludge. The International Harvester Company, which it had a right to do, took down piecemeal and removed to its South Chicago Works, the sintering plant, which would cost upwards—as now today almost prohibitive—a quarter of a million dollars. It dismantled all of its buildings, took them down; moved away the housing for the miners that lived on the location, on the mine property. They took all the machinery out of the shaft, took the piping out of the shaft. They took whatever tools were needed, and what were worth saving. They salvaged everything below, because the water would fill it up, and the casing would make it impossible for anyone to go in until thousands of dollars had been spent to rehabilitate the mine. They took out the long pipe lines, because they had to ventilate with compressed air. They took out the skip, the elevators, which are buckets running over guiding wheels to lift the ore out. They took away all movable machinery. They stripped the property down to the point where there was nothing left but the steel head frame. They sealed over the mouth of the shaft with mine rails, laid criss-cross, and set in concrete, so nobody could get in there and get hurt. Now, if the International Harvester Company, with its ability, was deciding to take the loss it took in deciding to cease to mine that property, no one else would go in there, with the handicap of a quarter of a million dollars sintering plant to replace, and all of the machinery, and perhaps $150,000 dewatering cost, and the replacement of timber, when the ore body in the mine is all soaked with water, and mushy. In that condition, it all falls down, as a tremendous weight, to crush the timbers. While a mine is kept pumped out, the ore body tends to arch and support itself, and the timbers do not crush—and with all that handicap and all this extra expense, for another organization to go into that mine, and mine it, it seems to me—and the Pine Land Company's officials and stockholders all agreed that it was prohibitive. The exploration to the north indicated that there were not

enough faces in which miners could work, and cave back, and bring out ore, to make the production of a sufficient number of thousands of tons to carry the overhead of the rehabilitation, and putting the mine into order once more. I could go on and elaborate indefinitely."

Both Mr. Warren and Mr. Calvin concluded that the mine was worthless to the owners. That they came to this conclusion in 1938 is entirely free from doubt. But notwithstanding International's abandonment of the lease, the owners did not assume to abandon the mine until independent tests had been made. However, these tests merely confirmed the poor structure of the ore at the only level or levels where mining operations could be carried on. In this connection, the written report of Calvin dated September 24, 1938, is illuminating, in that it reflects the conclusion that had been arrived at and contains the information which induced the owners to abandon the mine. The report or memorandum begins as follows: "When the Bruce Mine lease was surrendered by the International Harvester Company in July this year, there was no question in the minds of these experienced operators but that it was a fact that the property did not contain ore which was acceptable to its blast furnace men and which could be recovered at any reasonable cost figure in quantities sufficient to continue the lease. A determined effort had been made to develop the property in such a way and to such an extent that if it were commercially possible, mining operations would have continued until all of the ore was exhausted."

The report then summarizes the early drillings and the results of actual operation, and concludes:

"Ore Non-Mineable: As shown on the cross sections, there are 3 classifications of ore in the Bruce Mine:

1. Direct Shipping Ore.,
2. Wash Ore.,
3. Manganiferous Paint Rock.

"As we view the situation, the large tonnage remaining from the original estimate is non-mineable on account of the great mining hazard involved both in development and the recovery of the ore, excessive costs due to the great pressure and volume of water previously encountered. Experience has indicated that there is considerable doubt if a lower level could be developed without the use of an air lock.

"Therefore, analyzing the mining possibilities as to each classification, we have

"1. A poor structure direct shipping ore of marketable grade, but not acceptable for blast purpose practice.

"2. A wash ore which can only be recovered by the underground high cost method of mining and which would require additional equipment, the erection of a concentrating plant and the construction of a tailings basin. We would expect about a 60% tonnage recovery, making the cost of the concentrate prohibitive.

"3. The manganiferous paint rock is out of consideration in its natural state as mined on account of poor structure, 40% through a 100 mesh screen with high moisture (18%). The poor structure makes it imperative that the ore be agglomerated before being used in the furnace. The Harvester Company has dismantled and removed the sintering plant and a new plant would cost very close to $250,000. Even if the plant had been left on the property, the sintered product could not be sold on the market at a price equal to the cost of mining and sintering.

"Due to all of the adverse conditions outlined above, we do not see any possibility of having the Bruce Mine operated again. Just prior to the time the International Harvester Company concluded to abandon the property the mine was a going concern and a producing property with an efficient plant; fully equipped with modern equipment in place and in use. The water had been kept out above the 614' level and there all the drifts were well timbered and the contract places were dry. A good track system was in daily use. The mine was under experienced and capable management with a seasoned, trained group of miners. The mine and sintering plant produced a product which was highly satisfactory for their particular use, both as to structure and to its manganese content, with the blast furnace department of the Harvester Company. To attempt to open up the Bruce Mine and get it on production by any mining company, would call for large initial expenditures and from the disappointments experienced during the last year or year and a half by the first operators when an earnest endeavor was certainly made to continue in the property and which culminated in the cancellation of the lease in 1938; the removal of all equipment and abandonment of the property, it

is my opinion that this mine never will be operated again."

It is in view of these circumstances that plaintiff contends that the mine was worthless in 1938. In addition, in support of that position, it points out that International was obliged under the lease to pay the entire 1937 tax; that it had paid the first half but that the Pine Land Company, of its own initiative, released the International of its obligation to pay the last half of the 1937 tax because it realized that the mine had no value and that it was going to be abandoned by both lessor and lessee. Moreover, the minutes of the meeting of the board of directors of the Pine Land Company held in December, 1938, disclose the following:

"The chairman stated that, as was known to all of the directors, the lease of the Bruce Mine, comprising the East Half of the Northwest Quarter (E½ NW¼) of Section Twenty-seven (27), Township Fifty-eight (58) North, of Range Twenty (20) West, St. Louis County, Minnesota, was cancelled by the lessee, the International Harvester Company, on July 18, 1938; the property belonging to said lessee was removed from said Bruce Mine as soon as possible thereafter; and the mine was abandoned by said lessee, as worthless.

"After due discussion, because of said facts stated by the chairman, upon motion duly made and seconded, the following motion was unanimously adopted:

" 'Whereas, the lease of the Bruce Mine, comprising the East Half of the Northwest Quarter (E½ NW¼) of Section Twenty-seven (27), Township Fifty-eight (58) North, of Range Twenty (20) West, St. Louis County, Minnesota, dated March 31, 1920, modified by First Supplemental Agreement dated October 1, 1925, and by Second Supplemental Agreement of May 31, 1933, was, on July 18, 1938, cancelled by International Harvester Company, lessee, for the reason that all available ore was unmineable, and that therefore the property was worthless;

" 'Therefore, be it resolved, that due to the Bruce Mine being entirely worthless, the cost, and the March 1, 1913, value on said property be charged off on the books of the Pine Land Company in 1938 as an entire loss.

" 'Be it further resolved that, due to the worthlessness of this property, it be abandoned, and that no more taxes be paid thereon.' "

In January, 1939, the stockholders passed a resolution ratifying the directors' actions.

The Government asserts, however, through its witnesses Gordon and Johnson, that the mine had substantial value in 1938. Neither of these engineers had been on the property nor in the mine in any professional capacity. Their opinions are based primarily on the estimate found in Form D, and which indicates some twelve million tons of ore were to be found in the property and from the fact that the International had removed less than two million tons when it abandoned operations. They expressed no definite opinion or view as to the practical difficulties of making the mine pay in 1938, but conclude that throughout the years the mine could be operated at a profit. It is to be gathered from their testimony that it is the Government's position that the Bruce Mine had at least a potential value; that it would be worth while for some operator who could afford to keep the mine, and then later on have it developed when the demand for ore would justify its operation. These two witnesses are of the opinion that all of the marketable ore in the Mesabi Range will probably be exhausted in the next thirty years, and the necessity of removing all available ore during that period in order to utilize the existing facilities, transportation and others, would result in the obtaining of some method whereby the remaining ore could be extracted and sold at a profit. In other words, even though the mine could not be operated in 1938 at a profit, it is their opinion that, by reason of its potential value, it would be advisable to retain ownership in the hope that future demands and improved methods in the mining industry would permit a profitable operation.

Undoubtedly, there is a marked conflict in the testimony as to the value of this mine in 1938, but it may be observed that the Government witnesses dealt in generalities and approached the question of values abstractly. They inclined to view the entire situation taxwise, both Federal and State, rather than from the viewpoint of one who is actually on the ground and faced with the practical question of successful operation. In fact, Mr. Gordon stated that he looked at the value of the Bruce Mine to the mining industry, rather than to the particular owner involved. The

value deductible, however, is the value to the taxpayer. Shoenberg v. Com'r, 9 Cir., 1935, 77 F.2d 446. Granted that some day, because of improved methods not now known or envisaged, some operator may find it possible to equip the Bruce Mine at a price which now seems exorbitant and operate it at a profit, it must be recognized that, in light of the weight of the evidence, this is wishful thinking. Value based on speculation is irrelevant. DeLoss v. Com'r, 2 Cir., 1928, 28 F.2d 803. Some suggestion has been made that it might be possible to extract some of the ore by way of open pit mining, but the evidence clearly establishes the fact that, by reason of the heavy overburden, it is not feasible to transform this underground mine into an open pit mine. Certainly, it is fair to find from the testimony that, from all of the dependable information now available to a practical and reasonably prudent mine operator, this particular mine had no market value in 1938, and in this connection cancellation of the lease by International is an important fact in so far as it tends to discredit the mine in the eyes of interested operators.

Whether any particular mine is worthless has given rise to a difference of opinion ever since man discovered the value of metals. A mine cannot be valued by the same standards as other property. We are continually delving into the unknown. A mine which has an abundance of merchantable ore may nevertheless be valueless if it cannot be produced at a profit. Many an investor has had to acknowledge that fact much to his sorrow. Indeed, it is a fair assumption that, with the present history of this mine, and based on the weight of the testimony in this record, no Securities Commission would permit the issuance of a single security based on the expected profits to be made on the mining operations therein. From a practical and common sense viewpoint, therefore, it seems to follow that one is entirely justified in concluding from the weight of the evidence herein that the mine was valueless to the taxpayer in 1938.

In determining whether there was an abandonment of this mine by the owners in 1938, it follows that Section 23 (f) must be interpreted in a practical manner. It is not necessary that there be an abandonment within the meaning of real property law, or that legal title must be lost. Rhodes v. Com'r, 6 Cir., 100 F.2d 966. That the loss became fixed by an identifiable event seems clear. The cancellation of the lease, the forgiveness of the 1937 taxes, and the resolution of the Board of Directors of the Pine Land Company adequately meet that requirement. These same factors strongly support plaintiff's contention that an abandonment took place within the meaning of the Act. The good faith of the resolution of the board of directors finally abandoning the property is borne out by the subsequent approval of the stockholders early in 1939. While it is urged that abandonment does not become actual until the stockholders consent, Starrett Corp. v. Fifth Ave. & 29th St. Corp., D.C. S.D.N.Y. 1932, 1 F.Supp. 868, 869, we are dealing with a statute which does not necessarily require abandonment in the strict legal sense. Our query is, Has plaintiff established that the owners, in exercising reasonable business prudence, determined that the mine should be, and was, abandoned as worthless? Every incident supports the affirmative of that question, and subsequent events tend to support the good faith and finality of the intention to abandon. If the Pine Land Company had not intended to do that which it had determined by its resolution to abandon, then without cause or hope of recoupment it forgave the International some $20,000 in taxes, which became a lien on the property, together with penalty and interest as of January 1, 1939. It is not reasonable to believe that this act would have taken place in absence of an actual abandonment. In addition, it permitted the International to seal the shaft and allowed the property to stand idle, accumulating water, and made no effort during the entire year of 1938 to prepare the mine for future operations. When the Pine Land Company was dissolved, it did not deem the mine to be of sufficient value to assign its interest to the plaintiff. At the time of the trial, the back taxes with penalties aggregated $225,070.65. True, some of the incidents referred to took place after 1938, but they are not without some probative value in that they are persuasive factors in establishing the true weight which should be attached and given the facts and circumstances which did take place in 1938 and which, from a reasonable and common sense viewpoint, fully justify the finding that an abandonment took place in 1938. If one desired to be overly technical and to hold the taxpayer to a rigid test, tantamount to a strict legal abandonment, the present situation may fall short of such

standards. Recognizing, however, that the burden of proof placed upon the taxpayer is at best a difficult one, it would seem that the matter should be looked at in a practical way. Everyone must concede that this mine has actually been abandoned. The only question is, When did the abandonment occur? Every reasonable hypothesis supports the plaintiff's position that there was an abandonment in 1938.

 In holding that the entire value of the Bruce Mine was a capital loss in 1938, the other issues become irrelevant. However, they may be briefly considered. As stated above, when the International leased the Bruce Mine it paid the Pine Land Company $125,000 in addition to the agreed royalty. The Commissioner held that this amount was in the nature of advance royalties. Plaintiff concedes that, if the $125,000 was in the nature of advance royalties, the law and regulations support the Commissioner's position. But plaintiff takes issue as to whether the $125,000 was in the nature of advance royalties. This becomes a fact question. The only testimony on the issue was given by Mr. Warren. He stated that the $125,000 was paid by the International as reimbursement of previously incurred expense by the Pine Land Company. It represented the expenses which this fee owner had been put to with respect to the property. The testimony of Mr. Warren was uncontradicted and uncross-examined. It was given by one who was in a position to know the real character and purpose of the payment. While a tenant is not required to reimburse his lessor for expenses previously incurred, it does not follow that he cannot do so. If Mr. Warren's testimony is true, then the payment was simply a return of capital and not taxable as income. Eisner v. Macomber, 1920, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. While the defendant seeks to characterize the payment as a bonus or a gratuity, the fact

remains that the only testimony on the question amply sustains plaintiff's position herein. No good reason is suggested why Mr. Warren's testimony and explanation of the payment is not sound and reliable. It follows, therefore, that the Commissioner erred in considering the amount referred to as income.

 The other question refers to the taxability of depletion on ore not mined. Under the terms of Section 4 of Article VI of the lease, International agreed to mine a specified minimum amount of ore per year, and if that much ore was not mined, the company agreed to pay minimum royalties on the basis of which it would have been required to pay had the ore been mined. If thereafter International removed the ore covered by the minimums, it would not be required to pay any additional royalties. Prior to the termination of the lease in 1938, International had paid royalties on ore which it had not mined. One-half of these royalties had been received by the Pine Land Company, and in reporting these advance royalties, for income purposes, the Pine Land Company had deducted a reserve for depletion. The total amount of the reserve for depletion so deducted with respect to these royalties was $114,354.26, and the Commissioner contended that this amount should be included in the net income of the Pine Land Company for 1938. Plaintiff concedes that the regulations and Lamont v. Com'r, 8 Cir., 1941, 120 F.2d 996, support the Commissioner's position in the instant case. In addition, however, since the arguments herein, Douglas v. Com'r, 8 Cir., 134 F.2d 762, has been decided, confirming the view set forth in the Lamont case and setting at rest any question as to the correctness of the Commissioner's decision in this respect.

Findings of fact and conclusions of law in harmony herewith may be presented on five days' notice. An exception is reserved to the defendant.